UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

A. RAYMOND TINNERMAN
MANUFACTURING, INC.,

                           Plaintiff,

v.

TECSTAR MANUFACTURING COMPANY,

                          Defendant.

Case No. 12-CV-667-JPS

ORDER

---

1.    BACKGROUND

Seeking payment for goods accepted by a commercial counterparty, Plaintiff A. Raymond Tinnerman Manufacturing, Inc. ("A. Raymond") filed a complaint against Defendant TecStar Manufacturing Company ("TecStar") bringing claims of: (i) breach of contract; (ii) "account stated" (Docket #1, 4); (iii) unjust enrichment; and (iv) promissory estoppel. (Docket #1).

A. Raymond moves for partial summary judgment against TecStar "for the $1,722,743.52 worth of goods A. Raymond manufactured for TecStar, delivered to TecStar, TecStar accepted, and which TecStar has failed to pay for" on theories of breach of contract (Docket #10, 9) and unjust enrichment (Docket #10, 10). (Docket #9, 1).[1]

2.    FACTS

Except as noted *infra*, the following facts are undisputed between the parties.

---

[1] A. Raymond's complaint also includes a claim for goods-in-progress which were not accepted by TecStar (the "Termination Claim"). (Docket #1). The Termination Claim is not a subject of A. Raymond's motion for partial summary judgment.

In 2008, Solyndra LLC ("Solyndra"), a California-based manufacturer of solar panels, approached TecStar, a Wisconsin-based manufacturer, with a view to obtaining certain inputs for its solar panels. (Docket #17, ¶¶ 1, 3, and 4). "After Solyndra determined that TecStar was capable of performing the molding operations required for its solar panels, Solyndra directed that TecStar purchase components and raw materials only from certain specified suppliers." (*Id.*, 6).

Against this backdrop, TecStar issued purchase order numbers 034388, 037456, 039682, and 040753 (the "Purchase Orders") for parts ("Parts") to an entity named Tinnerman Palnut Engineered ("Palnut"). (Docket #1-2, 2-17); (Docket #13, ¶ 1).[2] The Purchase Orders expressly incorporate TecStar's purchase order terms and conditions (the "Terms & Conditions" and, together with the Purchase Orders, the "Contracts"). (*Id.*); (Docket #13, ¶ 3).[3]

---

[2] *TecStar* submits, as a proposed fact, that A. Raymond acquired Palnut in October 2009 as an asset purchase. (Docket #31, ¶ 87). However, Jean Brendamihl, "a purchasing coordinator for TecStar" (Docket #30, 6) could not pin-point when in time she first became aware of A. Raymond's acquisition of Palnut (Docket #23-8, 4) but states she was aware of that acquisition by January 2011 (*Id.*, 6).

The Purchase Orders bear dates of 05/05/2010, 1/13/2011, 04/11/2011, and 06/30/2011. (Docket #1-2, 2-17).

[3] A. Raymond claims that the Purchase Orders were assigned by Palnut to A. Raymond. (Docket #10, 5 (¶ 2)). In support of this proposed fact, A. Raymond cites only to a bald legal conclusion by Timothy O'Neil, Chief Financial Officer for A. Raymond's corporate parent, that Palnut "subsequently assigned" the Purchase Orders to A. Raymond. (Docket #9-2, 7).

The Court's analysis *infra* in Section 4.3.1 does not turn on assignment. Rather, the Court finds *infra* that the undisputed facts clearly demonstrate that A. Raymond stepped into Palnut's shoes for the Contracts and TecStar acquiesced by accepting both the Parts which are the subject of the Finished Goods Claim (defined *infra*) as well as corresponding Invoices (defined *infra*).

A. Raymond shipped Parts to TecStar. (Docket #13, ¶ 8); (Docket #10-5). "Each time A. Raymond shipped Parts to TecStar, it sent an invoice requiring payment within 45 days [("Invoices")]." (*Id.*). The Invoices explicitly reference the Purchase Orders. (Docket #10-5). "Beginning in the summer of 2011, TecStar began to fall behind on its payments to A. Raymond." (Docket #13, ¶ 9). Moreover, TecStar's acceptance of the Parts which are the subject of A. Raymond's Finished Goods Claim (defined below) is not disputed. *See* (Docket #13, ¶¶ 8, 9, 10, 13 and 16).

On September 1, 2011, TecStar sent *A. Raymond* notice by e-mail advising that Tecstar was terminating certain purchase orders. (Docket #13, ¶ 12); (Docket #9-6). The subject line of that e-mail states "Cancelation [sic] of P.O.'s 37456, 40725, 40648 ARaymond Tinnerman" (Docket #9-6).

A. Raymond asserts that, as of September 1, 2011, "TecStar owed A. Raymond $1,722,743.52 for Parts A. Raymond had delivered ('the Finished Goods Claim')." (Docket #13, ¶ 13). In response, TecStar contends that it "did not owe Tinnerman any sums for the Finished Goods Claim." (*Id.*). Notwithstanding that contention, TecStar offers "[n]o dispute regarding the amount invoiced." (*Id.*).

On September 28, 2011, A. Raymond sent a letter to TecStar demanding full payment of outstanding past-due balances owed to A. Raymond, including the Finished Goods Claim. (Docket #10-7, 2); (Docket #13, ¶ 15).

Notwithstanding that demand, TecStar has failed to pay A. Raymond's Finished Goods Claim and has stated that it will not pay "unless

and until TecStar's customer, Solyndra, first pays TecStar." (Docket #10-2, 3); (Docket #13, ¶ 16).[4] [5]

3.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine dispute of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

4.   DISCUSSION

   4.1   Jurisdiction and Venue

The parties' citizenship is diverse within the meaning of 28 U.S.C. § 1332 (a)(1), the amount-in-controversy requirement of § 1332 is satisfied,

---

[4] In its proposed facts, TecStar explains that its "role in Solyndra's supply chain was for molded plastic components that incorporated Tinnerman's parts" (Docket #17, ¶ 18) and "[t]he vast majority of Tinnerman's finished goods were shipped and invoiced by TecStar to Solyndra as part of the solar panel components" (*Id.*, ¶ 13).

[5] Paragraph 19 of the Terms & Conditions generally provides for submission of claims or disputes "to non-binding mediation prior to initiation of any formal legal process." (Docket #23-9, ¶ 19). On June 28, 2012, the parties mediated their dispute and no resolution resulted. (Docket #13, ¶ 19). Thereafter, this lawsuit was filed.

and venue pursuant to 28 U.S.C. § 1391 is proper. (Docket #1, ¶¶ 1-4); (Docket #5, ¶¶ 1-4).

   4.2   Choice-of-Law

The Terms & Conditions provide that orders "shall be governed by the laws of the State of Wisconsin" (Docket #23-9, ¶ 20).[6]

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. V. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); In *re Jafari*, 569 F.3d 644, 648 (7th Cir. 2009).

This Court sits in Wisconsin and Wisconsin state law recognizes "freedom to contract for choice of law" with the "qualification" that "parties cannot, by contact, override fundamental policies of the state whose law would be applicable absent the choice of law provision." *Drinkwater v. Am. Family Mut. Ins. Co.*, 2006 WI 56, ¶ 25 (citations and quotations omitted).

Here, application of Wisconsin law is uncontested (Docket #5, ¶ 4) and the Court is unaware of any relevant fundamental public policy that would militate against enforcing the choice-of-law clause in the Terms & Conditions. Therefore, the Court will apply Wisconsin law to the Finished Goods Claim.

   4.3   Breach of Contract

      4.3.1   UCC Analysis

As noted *supra* in Footnote Five, the Terms & Conditions state, in relevant part, that the Contracts "shall be governed and interpreted by the UCC as adopted in the State of Wisconsin U.S.A." (Docket #23-9, ¶ 28).

---

[6] Another paragraph in the Terms & Conditions states that: "This agreement between the parties shall be governed and interpreted by the UCC as adopted in the State of Wisconsin U.S.A., and the United Nations Convention for the International Sale of Goods. All disputes involving this agreement shall be adjudicated in Wisconsin." (Docket #23-9, ¶ 28).

Wisconsin's codification of the Uniform Commercial Code ("UCC") is found in Chapters 401 to 411 of Wisconsin's statutes. *See* Wis. Stat. § 401.101. Chapter 402, in particular, generally governs transactions in goods. Wis. Stat. §§ 402.102.[7]

Wis. Stat. § 402.204(1) provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

As stated *supra* in Section Two, the following course of conduct between the parties is undisputed. TecStar issued the Purchase Orders (incorporating the Terms & Conditions) for Parts to Palnut. (Docket #13, ¶¶ 1 and 3). Thereafter, A. Raymond shipped Parts to TecStar. (Docket #13, ¶ 8); (Docket #10-5). Each time A. Raymond shipped Parts to TecStar, it sent an Invoice requiring payment within 45 days. (*Id.*). Those Invoices explicitly reference the Purchase Orders. (Docket #10-5). "Beginning in the summer of 2011, TecStar began to fall behind on its payments to A. Raymond." (Docket #13, ¶ 9). Moreover, TecStar accepted the Parts which are the subject of A. Raymond's Finished Goods Claim. *See* (Docket #13, ¶¶ 8, 9, 10, 13, and 16).

In light of these undisputed facts, the Court is obliged to find that this course of conduct between TecStar and A. Raymond recognized the existence of a contractual relationship between these two entities: A. Raymond stepped into Palnut's shoes for the Contracts and TecStar acquiesced by accepting

---

[7] TecStar explains that the Parts are metal rails, *See* (Docket #17, ¶ 5), and so the parties do not dispute that the Parts are "goods" within the meaning of Wis. Stat. § 402.105(c).

both the Parts which are the subject of the Finished Goods Claim as well as the Invoices.[8]

It is axiomatic that "[t]he buyer must pay at the contract rate for any goods accepted." Wis. Stat. § 402.607(1). When the buyer fails to pay the price as it becomes due, the seller may recover, *inter alia*, the price of goods accepted. Wis. Stat. § 402.709(1)(a); *Menard, Inc. v. Liteway Lighting Products*, 282 Wis.2d 582, ¶ 52 (2005).

As noted *supra* in Section Two, A. Raymond asserts that, as of September 1, 2011, TecStar owed A. Raymond $1,722,743.52 for the Finished Goods Claim. (Docket #13, ¶ 13). In response, TecStar contends that it "did not owe Tinnerman any sums for the Finished Goods Claim." (*Id.*). Notwithstanding that contention, TecStar offers "[n]o dispute regarding the amount invoiced." (*Id.*). On September 28, 2011, A. Raymond sent a letter to TecStar demanding full payment of outstanding past-due balances owed to A. Raymond including the Finished Goods Claim. (Docket #10-7, 2); (Docket #13, ¶ 15). Notwithstanding that demand, TecStar has failed to pay A. Raymond's Finished Goods Claim and has stated that it will not pay "unless and until TecStar's customer, Solyndra, first pays TecStar." (Docket #10-2, 3); (Docket #13, ¶ 16).

Against this backdrop, the Court is obliged to find that TecStar has failed to pay the past-due Finished Goods Claim and so A. Raymond is entitled to recover the amount (undisputed by TecStar (Docket #13, ¶ 13)) claimed under the Finished Goods Claim – $1,722,743.52 – unless TecStar's contractual defenses to A. Raymond's Finished Goods Claim are

---

[8] As stated *supra*, the Invoices explicitly reference the Purchase Orders (which, in turn, expressly incorporate the Terms & Conditions).

meritorious.[9] For the reasons set forth below, the Court finds those defenses fail.

### 4.3.2 TecStar's Contractual Defenses

#### 4.3.2.1 Standing-to-Sue

TecStar argues that A. Raymond lacks standing-to-sue for want of a valid assignment of the Contracts from Palnut to A. Raymond. (Docket #12, 22). This argument reflects a fundamental misunderstanding of the consequences of TecStar's course of conduct vis-a-vis A. Raymond.

As explained *supra* in Section 4.3.1, A. Raymond stepped into Palnut's shoes for the Contracts and TecStar acquiesced by accepting both the Parts which are the subject of the Finished Goods Claim and the corresponding Invoices. In other words, TecStar and A. Raymond established contractual privity *anew* by their course of conduct and operated as though the Contracts governed their relationship.

Therefore, if *A. Raymond* had attempted to assign the Contracts to a *third-party* at some point in time after TecStar had accepted Parts delivered by A. Raymond (invoiced with reference to the Purchase Orders), then *that assignment* might logically be protested by TecStar on grounds that the Contracts require its prior written consent *so long as* TecStar has not formed

---

[9] A. Raymond's breach-of-contract analysis focuses on Wis. Stat. § 402.607 (which sets forth the basic proposition that "[t]he buyer must pay at the contract rate for any goods accepted"), (Docket #10, 9);(Docket#16, 4);(Docket #23, 11), but does not cite the corresponding remedy provision: Wis. Stat. § 402.709(1)(a) (recognizing an "[a]ction for the price" of goods accepted when the buyer fails to pay the price as it becomes due).

The Court finds that A. Raymond's citation to § 402.607 adequately placed TecStar on notice of the nature of A. Raymond's breach-of-contract theory and so construes A. Raymond's breach-of-contract theory as an action for the price in the amount of the Finished Goods Claim.

a contractual relationship *anew* with that third-party by its course of conduct (*e.g.*, by accepting Parts delivered by the third-party (invoiced with reference to the Purchase Orders)).

For these reasons, TecStar's standing-to-sue and invalid assignment defenses fail.

####### 4.3.2.2 Pay-If-Paid

TecStar submits that A. Raymond and Solyndra "agreed to the formula controlling the prices and quantities" set forth in the Purchase Orders by entering into memoranda of understanding with each other. (Docket #30, 2). According to TecStar, any changes to these understandings were hashed out between A. Raymond and Solyndra, after which Solyndra would direct TecStar to issue purchase orders accordingly to A. Raymond. (Docket #30, 11).

Based on those assertions, TecStar argues brazenly that, "[a]s TecStar has maintained all along, Tinnerman's remedies are with Solyndra."[10] (Docket #30, 4). "TecStar maintains it was a pass-through for the Solyndra-Tinnerman relationship and its Purchase Order Terms and Conditions protected it as such." (Docket #30, 16).

Before addressing TecStar's *force majeure* and limitation-of-liability arguments *infra*, the Court will address TecStar's characterizations of its commercial relationship with A. Raymond.

---

[10] Tellingly, TecStar does not address why it paid some of A. Raymond's invoices for Parts delivered to and accepted by TecStar. If TecStar truly believed that the Purchase Orders were merely "forecasts" and not legally-binding contracts, why pay?

TecStar's pass-through argument holds no water. TecStar was free to insist that Solyndra contract directly with A. Raymond and issue purchase orders for Parts to be delivered to TecStar. But alas, TecStar did not.

Tragically, once Solyndra's payments to TecStar fell behind the "Net 45" payment term in the Purchase Orders governing TecStar's commercial relationship with A. Raymond – resulting in a mismatch of cash flows – the folly of serving as the *contractual* counterparty to A. Raymond in Solyndra's supply chain became all-too-real for TecStar.

The Contracts do not contain a pay-if-paid clause and so TecStar asks this Court to endorse untenable interpretations of the *force majeure* and limitation-of-liability provisions in the Terms & Conditions. Although TecStar's predicament is truly tragic – it "accepted additional tooling orders from Solyndra and borrowed money to start to building over $10,000,000.00 worth of tooling and equipment" "in reliance on" the U.S. Department of Energy having provided financing assistance to Solyndra (Docket #17, ¶¶ 9 and 10)[11] – this Court is obliged to find that TecStar must honor its contractual obligation to pay the Finished Goods Claim. *See* Section 4.3.1 *supra.*

### 4.3.2.3  Force Majeure

Paragraph 5 ("TERMINATION") of the Terms & Conditions provides, in part, that:

> "*Neither party will be liable to the other for any delay or failure to perform if that delay or failure results from an unforeseeable cause beyond it's [sic] reasonable control*, except that TecStar may

---

[11] [Greek mythology provides the story of Icarus. Emboldened by the sensation of flight, Icarus flew too close to the sun with wings made of wax and feathers notwithstanding warnings to the contrary. His wings melted and he fell tragically from the sky into the sea which now bears his name: the Icarian Sea.]

> terminate all or any portion of this order without liability to Seller if such delay or failure to perform by Seller or on behalf of Seller extends beyond thirty (30) days of TecStar's requested delivery date. TECSTAR'S TOTAL LIABILITY FOR DAMAGES UNDER THIS ORDER SHALL NOT EXCEED THE PRICE ALLOCABLE TO THE GOODS OR SERVICES GIVING RISE TO THE CLAIM. IN NO EVENT WILL TECSTAR BE LIABLE FOR INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES."

(Docket #23-9, ¶ 5) (emphasis added).

TecStar asks the Court to read the italicized language *supra* (the "*Force Majeure* Clause") to excuse its failure to pay the Finished Goods Claim. (Docket #13, 13). In particular, TecStar argues that "given Solyndra's integral role in negotiating part, price and quantity with Tinnerman, Solyndra's financial collapse constituted an unforeseeable cause excusing TecStar's payment to Tinnerman." In the Court's view and as a matter of logic, that proposition fails because it is nonsense: the specter of financial failure is omnipresent in human existence and so is eminently foreseeable. Here, even more so, as TecStar paints a portrait of Solyndra operating at the *frontier* of America's search for low-cost energy.

Moreover, in support of its bold legal proposition that "financial collapse is covered under a force majeure clause when the source of the failure to pay is an unforeseen event and the party raising the defense is without fault," TecStar fails to cite a single Wisconsin case (and the Court is not aware of one).

TecStar asks the Court to view *the* cause of its nonperformance as Solyndra's financial failure and so the Court analyzed (and rejected) that argument on the merits immediately above. Viewed in a different light, TecStar's nonperformance was caused by a mismatch in its cashflows and

*that* cause is certainly within its reasonable control: TecStar was free to insert a pay-if-paid term in the Contracts. Alas, TecStar did not.

### 4.3.2.4 Limitation-on-Liability

Paragraph 26 ("<u>LIMITATION ON BUYER'S LIABILITY</u>") of the Terms & Conditions provides that:

> "In no event shall Buyer be liable to Seller for anticipated profits or for incidental or consequential damages for a claim of any kind, or for any loss or damage arising out of or in connection with this agreement, or from any performance or breach, termination, or expiration of this agreement or any order."

(Docket #23-9, ¶ 26).

TecStar reads this limitation-on-liability provision (the "Limitation-on-Liability Clause") to mean that "TecStar would not be liable to Tinnerman for any breach of any kind." (Docket #12, 17).

Incredibly, TecStar chooses to ignore completely the clause in Paragraph 5 of the Terms & Conditions which states:

> "TECSTAR'S TOTAL LIABILITY FOR DAMAGES UNDER THIS ORDER SHALL NOT EXCEED THE PRICE ALLOCABLE TO THE GOODS OR SERVICES GIVING RISE TO THE CLAIM. IN NO EVENT WILL TECSTAR BE LIABLE FOR INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES."

(Docket #23-9, ¶ 5) (emphasis in original).

Moreover, TecStar ignores the relevant teachings of the Wisconsin Supreme Court as set forth in *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406 (1978), and *Phillips Petroleum Co. v. Bucyrus-Erie Co.*, 131 Wis.2d 21 (1986).

In *Murray*, the Wisconsin Supreme Court set forth the following analysis of the relevant Wisconsin UCC provisions and principles:

> The damages which would otherwise be available upon a breach of contract may be altered or limited by the parties pursuant to sec. 402.719, Stats. This section gives the parties substantial latitude to fashion their own remedies for breach of the contract. However, the UCC disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach. *Chemetron Corporation v. McLouth Steel Corporation* (D.C.Ill.1974), 381 F.Supp. 245, 250, affirmed 522 F.2d 469 (7th Cir. 1975).
>
> The drafters of the UCC recognized that:
>
>> "…it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract…"
>
> Official Comment 1, sec. 2-719, UCC; accord: *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 374 A.2d 144 (1976); *Wilson Trading Corporation v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968).
>
> Accordingly, any clause purporting to limit remedies in an unconscionable manner will be deleted, making the ordinary UCC remedies available as though the stricken clause had never existed. Official Comment 1, sec. 2-719, UCC.

83 Wis.2d at 418.

As noted above, the Terms & Conditions plainly state, in relevant part, that "[t]his agreement between the parties shall be governed and interpreted by the UCC as adopted in the State of Wisconsin U.S.A." (Docket #23-9, ¶ 28) so there must be "a fair quantum of remedy for breach of the obligations or duties outlined in the contract" as *Murray* contemplates. 83 Wis.2d at 418.

Nonetheless, TecStar argues that the Limitation-on-Liability Clause means that "TecStar would not be liable to Tinnerman for any breach of any kind." (Docket #12, 17). Therefore, this Court is obliged to delete that portion of the Limitation-on-Liability Clause that leaves A. Raymond with no remedy and remedy may be had as provided in Wisconsin's UCC. *Phillips Petroleum Co.*, 131 Wis.2d at 40 ("[I]n accordance with the code, the damage remedy is not that purportedly provided in the documents, but 'remedy may be had as provided in [the code]' (sec. 402.719(2), Stats.)[.]").[12]

As noted *supra* in Section 4.3.1, when the buyer fails to pay the price as it becomes due, the seller may recover, *inter alia*, the price of goods accepted. Wis. Stat. § 402.709(1)(a); *Menard, Inc. v. Liteway Lighting Products*, 282 Wis.2d 582, ¶ 52 (2005). Therefore, in light of the analysis set forth above, the Court is obliged to find that A. Raymond is entitled to recover the amount (undisputed by TecStar (Docket #13, ¶ 13)) claimed under the Finished Goods Claim: $1,722,743.52.

---

[12] In light of this analysis, TecStar's argument that "Tinnerman confuses liability disclaimers with limitation of remedies" (Docket #12, 19) is specious and contrary to the above-cited precedents of the Wisconsin Supreme Court.

Moreover, TecStar's argument that the Limitation-of-Liability Clause "makes sense," in light of the interrelationship of Solyndra, TecStar and A. Raymond, fails because: (i) TecStar and A. Raymond established contractual privity by their course of conduct and operated as though the Contracts governed their relationship (*supra* Section 4.3.2.1); (ii) the Terms & Conditions plainly state, in relevant part, that "[t]his agreement between the parties shall be governed and interpreted by the UCC as adopted in the State of Wisconsin U.S.A." (Docket #23-9, ¶ 28); and (iii) as explained above, this means that there must be "a fair quantum of remedy for breach of the obligations or duties outlined in the contract" as *Murray* contemplates. 83 Wis.2d at 418.

4.4 Unjust Enrichment

A. Raymond offers an unjust enrichment theory as an *alternative* to its contractual theory of the Finished Goods Claim. (Docket #10, 10). For the reasons set forth *supra*, A. Raymond prevails on its contractual theory of the Finished Goods Claim and so A. Raymond's unjust enrichment theory is moot. *Watts v. Watts*, 137 Wis.2d 506, 530 (1987) ("Unlike claims for breach of an express or implied in fact contract, a claim of unjust enrichment does not arise out of an agreement entered into by the parties.").

5. CONCLUSION

For the foregoing reasons, A. Raymond's motion for partial summary judgment (Docket #9) on its Finished Goods Claim will be granted.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff A. Raymond Tinnerman Manufacturing, Inc.'s Motion for Partial Summary Judgment (Docket #9) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that Plaintiff A. Raymond Tinnerman Manufacturing, Inc., have and recover $1,722,743.52 from Defendant TecStar Manufacturing Company for its breaches of the Contracts, together with costs as taxed by the clerk of the court.

Dated at Milwaukee, Wisconsin, this 4th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge